United States Courts
Southern District of Texas
FILED
July 16, 2024
Nathan Ochsner, Clerk of Court

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § | |
| v. | § § | CRIMINAL NUMBER |
| CHRISTOS CHARITOS | § § | C-24-368 |

INFORMATION

THE UNITED STATES ATTORNEY CHARGES THAT:

## COUNT ONE

**(Act to Prevent Pollution from Ships – 33 U.S.C. § 1908(a))**

1. At all times relevant to this Information, unless otherwise indicated:

The Defendant

    a. Defendant CHRISTOS CHARITOS was the Chief Engineer of the *M/V Good Heart*.

The *M/V Good Heart*

b. The *M/V Good Heart* was a 36,354 gross ton ocean-going bulk carrier that was registered in Liberia and had an International Maritime Organization number of 9397781. The vessel transported cargo worldwide including in Corpus Christi, Texas. The vessel was operated by Eurobulk Ltd. ("Eurobulk").

c. The *M/V Good Heart* had an Engine Department headed by a Chief Engineer, who was assisted by a Second Engineer. The Chief Engineer and Second Engineer were also assisted by a Third Engineer, Fourth Engineer, and three Oilers. The subordinate crew members reported to the Second Engineer, who reported directly to the Chief Engineer. Each crew member of the Engine Department was an agent or employee of Eurobulk and acted within the scope of that agency or employment and for the intended benefit, at least in part, of Eurobulk.

d. The Chief Engineer on board the *M/V Good Heart* had overall responsibility for the operation of the Engine Department, including the supervision of daily operations, formulation and implementation of engine room procedures, and verification that all systems, including the Oily Water Separator ("OWS"), a pollution prevention device required by law, were properly functioning. The Master of the *M/V Good Heart* was responsible for maintaining an Oil Record Book ("ORB")

that accurately recorded, among other things, the transfer, disposal, and discharge overboard of oil residue, oil and oily mixtures, and machinery space bilge water on board the vessel. The Second Engineer was responsible for the day-to-day execution of the Chief Engineer's orders and had authority to direct junior crewmembers. When directing junior crew members to perform operations that were required to be recorded in the ORB, the Chief Engineer, as a person in charge of the of the operation, was required to sign the entries documenting such operations.

The Act to Prevent Pollution from Ships and the MARPOL Protocol

e. The Act to Prevent Pollution from Ships ("APPS"), Title 33, United States Code, Sections 1901 *et seq.*, was enacted by Congress in 1980 to implement two related international treaties to which the United States was a signatory: the 1973 International Convention for the Prevention of Pollution from Ships; and the Protocol of 1978 Relating to the International Convention for the Prevention of Pollution from Ships. *See* 33 C.F.R. § 151.01 *et seq*. Together, these treaties, which sought to minimize pollution from ocean-going vessels, were known as the "MARPOL Protocol" or "MARPOL."

f. APPS made it a crime for any person to knowingly violate MARPOL, APPS, or the regulations promulgated under APPS. These regulations applied to all commercial vessels operating in the navigable waters of the United

States or while in a port or terminal under the jurisdiction of the United States, including vessels operating under the authority of a country other than the United States.

g. APPS also authorized the United States Coast Guard (hereinafter, the "Coast Guard"), an agency within the United States Department of Homeland Security, to promulgate regulations implementing the MARPOL Protocol, pursuant to Title 33, United States Code, Section 1903(c)(1). Pursuant to that authority, the Coast Guard established Title 33, Code of Federal Regulations, Sections 151.01 *et seq.*, to ensure compliance with the MARPOL Protocol and to prevent pollution in United States waters.

Regulation of Oil-Contaminated Waste from Ocean-Going Vessels

h. Principal sources of water pollution addressed by the MARPOL Protocol, APPS, and APPS regulations, were the oil residue, oil and oily mixtures, and oil-contaminated bilge water generated in the machinery space of large vessels, such as the *M/V Good Heart*.

i. The oil residue, oil and oily mixtures, and machinery space bilge water of such vessels were collected in tanks that are designed to hold the waste for proper disposal. Regulation 15 of MARPOL Annex I, and Title 33, Code of Federal Regulations, Section 151.10 (a)(5), provided that any discharge of oil or oily

mixtures into the sea from the machinery space bilges of an oil tanker, when the vessel is more than 12 nautical miles from the nearest land, were prohibited unless, among other things, the discharges, contained no greater than 15 parts of oil per million parts of water by volume ("15 ppm"). To facilitate the discharge of oil contaminated waste without causing pollution, all large vessels were required to have an OWS. The OWS was designed to remove oil contamination from bilge waste to produce water containing less than 15 ppm of oil, as measured by the OWS's Oil Content Meter ("OCM"), which could then be discharged overboard through an overboard discharge valve. If the OCM detected an oil content greater than 15 ppm in the effluent, it sounded an alarm, and shut down the pumps or diverted flow back to the bilges or bilge tank to prevent a discharge overboard of greater than 15 ppm. The MARPOL Protocol and APPS also required that oil residue, and other oily mixtures, which could not be processed through pollution control equipment, be disposed of by either burning such oily waste in a vessel's incinerator or by off-loading it to shore for proper disposal.

      j. The *M/V Good Heart* was constructed with a space known as the "duct keel". The duct keel is a tunnel at the bottom of the vessel that spans from the engine room forward under the cargo hold tanks. There is steam, fuel, ballast water and electrical piping and conduits in the duct keel. It is not permissible for oil waste to be stored in the duct keel because it was not listed on the vessel's

International Oil Pollution Prevention ("IOPP") certificate. The IOPP, among other things, designates the tanks on the vessel that are permitted to be used for the storage of oily waste and bilge water. If oily water is in the duct keel, then it must be processed through the OWS and OCM prior to being discharged overboard. Alternatively, the contents of the duct keel can be discharged to a shore-side facility or barge or incinerated in the on-board incinerator. Any transfer or discharge from the duct keel of oily waste must be recorded in the ORB.

Requirement that Vessels Maintain an Oil Record Book

k. To ensure that oily waste was properly processed and disposed of, Regulation 17 of MARPOL, Annex I, and Title 33, Code of Federal Regulations, Sections 151.25(a), (d), and (h), provided that, with regard to each vessel of at least 400 gross tons, each operation involving the disposal of oil residue, or the disposal or discharge overboard of bilge water, was required to be fully recorded, without delay and on a tank-to-tank basis, and signed by the person or persons in charge of the operation in the ORB. In addition, all emergency, accidental, or other exceptional discharges of oil or oil mixtures, including a statement of the circumstances of, and reasons for, the discharge, were also required to be recorded in the ORB, pursuant to Title 33, Code of Federal Regulations, Section 151.25(g). The ORB was required to be maintained on board the vessel for not less than three years and be readily available for inspection at all reasonable times, pursuant to

Title 33, United States Code, Section 151.25(k).

United States Enforcement of APPS

l. The Coast Guard was authorized to conduct inspections to determine whether vessels in U.S. waters were compliant with MARPOL, APPS, and other applicable federal regulations. In conducting its inspections, the Coast Guard was authorized to examine the vessel's ORB to determine, among other things, whether the vessel had operable pollution prevention equipment, whether it posed a danger to United States ports and waters, and whether the vessel had discharged any oil or oily mixtures in violation of law, pursuant to Title 33, Code of Federal Regulations, Sections 151.23(a)(3) and 151.23(c). In conducting inspections, the Coast Guard relied on the vessel's ORB to determine whether the vessel's crew was properly handling oil or oily mixtures pursuant to Title 33, Code of Federal Regulations, Section 151.23(c).

Transfers and Discharges of Oil-Contaminated Waste from the *M/V Good Heart*

m. During April 2023, on two occasions, Defendant directed and authorized lower-level engine room crew members to discharge oily water from the vessel's duct keel directly into the ocean, bypassing the OWS and OCM. These operations were not recorded in the ORB.

n. In April 2023, Defendant ordered a freshwater hose be connected

to the OCM. The purpose of the connection was to supply the OCM with fresh water instead of a sample of the OWS effluent. This connection therefore "tricked" the OCM and thus the oil content of the effluent of the OWS was not measured. Defendant then ordered the OWS to be energized and the contents of the bilge tank was discharged. This operation was not recorded in the ORB.

  2. On or about April 29, 2023, in the port of Corpus Christi, Texas, in the Southern District of Texas, Defendant

CHRISTOS CHARITOS,

knowingly failed to maintain, and caused the failure to maintain, an accurate Oil Record Book for the *M/V Good Heart* as prohibited by Title 33, Code of Federal Regulations, Section 151.25.

In violation of Title 33, United States Code, Section 1908(a) and Title 18, United States Code, Section 2.

  ALAMDAR S. HAMDANI
  UNITED STATES ATTORNEY

By: _____
  LIESEL ROCHER
  Assistant United States Attorney